1  G. Scott Sobel, Esq., SBN 124818
2  Law Office of G. Scott Sobel
   1180 S. Beverly Drive, Suite 610
3  Los Angeles, CA 90035-1158
   Tel: (310) 422-7067; Fax: (888) 863-5630
4  GScottSobel@gmail.com
5  Attorney for Plaintiffs and proposed Classes

6                    **UNITED STATES DISTRICT COURT**
7                         **DISTRICT OF ARIZONA**

8  |                                              | **Case No.**                                    |
9  | Alexander C. Baker;                          | **CLASS ACTION**                                |
10 | All other similarly situated Songwriters;    | **VERIFIED COMPLAINT AND DEMAND FOR BIRFURCATED** |
11 | Adam Bravery LLC;                            | **COURT TRIAL (Class Claims 1-5):**             |

All other similarly situated Royalty
Assignees;

          Plaintiffs,

              v.

American Society of Composers, Authors
And Publishers, aka ASCAP;

Broadcast Music Inc., aka BMI;

Mike O'Neill;

Erika Stallings;
              and
Does 1-10,
          Defendants.

1. **DECLARATORY JUDGMENT** ASCAP & BMI Mandatory Arbitration Clause is Void and Unenforceable for Economic Duress

2. **DECLARATORY JUDGMENT** ASCAP & BMI and Their Officials are State Actors

3. **DECLARATORY JUDGMENT** ASCAP & BMI Arbitration Clause Violates First, Seventh Amendment without Due Process

4. **DECLARATORY JUDGMENT** Performance Royalties are a Federally Protected Right `

5. **DECLARATORY JUDGMENT** ASCAP & BMI Owe Writers a Fiduciary Duty

**DEMAND FOR BIRFURCATED JURY TRIAL (Non-Class Tort Claims 6-11).**

1

2     Plaintiff Alexander C. Baker, by and through his attorney, brings this action on behalf

3   of himself and all other similarly-situated Songwriters ("Songwriter Class Members" or

4   simply "Songwriters"). Plaintiff Adam Bravery, LLC, by and through its attorney, brings

5   this action on behalf of itself and all other similarly-situated Royalty Assignees of

    Songwriters.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**I.  SHORT PLAIN STATEMENT OF THE CLASS ACTION CASE** ........1

   A.  ASCAP & BMI Owe a Fiduciary Duty to Songwriters And Must Be Held Accountable .................................................................................1

   B.  Songwriters' Constitutional Rights Must Be Restored .............................1

   C.  ASCAP & BMI Should Be Declared State Actors ...................................1

   D.  Alexander C. Baker and his Assignee Adam Bravery, LLC are Viable Class Representatives .................................................................................2

   E.  The Court Should Bifurcate the Class Action Case And Try It Purely As A Matter of Law .......................................................................................3

**II.  SHORT PLAIN STATEMENT OF THE UNDERLYING CASE** .........4

**III.  JURISDICTION** .................................................................................4

   A.  Federal Question Jurisdiction .................................................................4

   B.  Alexander Baker and Adam Bravery LLC Assert Diversity Jurisdiction ..4

   C.  Supplemental Jurisdiction .......................................................................5

**IV.  VENUE** .................................................................................................5

**V.  PARTIES** ..............................................................................................5

   A.  Plaintiffs ...................................................................................................5

   B.  Defendants ...............................................................................................6

   C.  Doe Defendants .......................................................................................7

**VI.  STANDING** .........................................................................................7

   A.  Individual Standing for Plaintiff Alexander C. Baker .............................7

   B.  Organizational Standing for Adam Bravery LLC ...................................8

**VII.  FACTS RELEVANT TO CLASS ACTION CLAIMS** .......................9

   A.  Background on ASCAP & BMI ...............................................................9

   B.  The Consent Decree ...............................................................................10

C. ASCAP & BMI Standard Writer "Agreement" .........................................11

D. Background on Class Representative Alexander Baker ...........................13

VIII.   CAUSES OF ACTION IN CLASS ACTION CASE ........................13

FIRST CAUSE OF ACTION ........................................................ 13

SECOND CAUSE OF ACTION ..................................................... 16

THIRD CAUSE OF ACTION ........................................................ 18

FOURTH CAUSE OF ACTION ..................................................... 21

FIFTH CAUSE OF ACTION ......................................................... 23

IX.   PRAYER FOR RELIEF ON CLASS ACTION CLAIMS...................24

A. Declaratory Relief .........................................................................25

B. Injunctive Relief ...........................................................................25

C. Costs and Fees ..............................................................................25

X.   DEMAND FOR COURT TRIAL ON CLASS ACTION CLAIMS......25

XI.   FACTS RELEVANT TO ALEXANDER BAKER'S UNDERLYING
CASE AGAINST BMI ...............................................................................26

A. The Baker-Marlo Divorce, Stipulation and Royalty Order ....................26

B. Baker's Assignment of Royalties to the LLC ...........................................27

C. BMI and Erika Stallings Fabricate a False "Dispute" and Repeatedly
Threaten to Stop Paying Royalties...........................................................28

D. Marlo Files Meritless Contempt Action Which is Dismissed .................32

E. BMI Officially Imposes Dispute Hold, But Then Pays Again Anyway....33

F. BMI Stops Paying Royalties ....................................................................34

XII.   CAUSES OF ACTION IN UNDERLYING CASE ...........................34

SIXTH CAUSE OF ACTION ........................................................ 34

SEVENTH CAUSE OF ACTION ................................................... 36

EIGHTH CAUSE OF ACTION ...................................................... 37

NINTH CAUSE OF ACTION ........................................................ 39

TENTH CAUSE OF ACTION ........................................................ 42

ELEVENTH CAUSE OF ACTION ........................................................ 46

**XIII.    PRAYER FOR RELIEF ON UNDERLYING CLAIMS .................50**

A.  Damages............................................................................................50

B.  Injunction ........................................................................................50

C.  Costs and Fees ..................................................................................50

**XIV.    DEMAND FOR JURY TRIAL........................................................51**

# I.    SHORT PLAIN STATEMENT OF THE CLASS ACTION CASE

(Songwriter Class and Assignee Class v. ASCAP & BMI)

## A.    ASCAP & BMI Owe a Fiduciary Duty to Songwriters And Must Be Held Accountable

1.      It is time that ASCAP & BMI are finally held accountable for the $2 billion they collect annually in music license fees. Half of that money is supposed to be paid to Songwriters as Performance Royalties, with only expenses taken out. (The other half is supposed to go to publishers). However, Songwriters are presently unable to conduct any type of audit of ASCAP & BMI, under the theory that ASCAP & BMI do not owe Songwriters a fiduciary duty. Songwriters come to this Honorable United States District Court, and do hereby challenge ASCAP & BMI, seeking Declaratory Judgment that yes, ASCAP & BMI do *so* owe Songwriters a fiduciary duty, and Songwriters do *so* have a right to audit ASCAP & BMI.

## B.    Songwriters' Constitutional Rights Must Be Restored

2.      Furthermore, Songwriters have discovered that their constitutional right to a civil jury trial under the First and Seventh Amendments was destroyed by the terms of a decades-old Consent Decree, which mandates that ASCAP & BMI force all Songwriters to submit to a Mandatory Arbitration Agreement as a pre-condition of receiving any Performance Royalties at all. Songwriters seek a Declaratory Judgment that receiving Performance Royalties is a federally-protected right, and that a Songwriter need not relinquish the right to petition (or any other constitutional right) as a precondition of receiving Performance Royalties.

## C.    ASCAP & BMI Should Be Declared State Actors

3.      Currently boasting an estimated 1.5 million writer members between them, ASCAP & BMI are 501(c)(3) non-profit "Performing Rights Societies" as defined under the Copyright Act. ASCAP & BMI are legally required to distribute the license

1  fee money collected to their Songwriter members, via regular quarterly royalty

2  payments, minus only operating expenses.

3  4.    Having long ago been found monopolists in federal antitrust litigation, ASCAP

4  & BMI are bound by a federal Consent Decree, which operates as federal law upon

5  them, compelling ASCAP & BMI to act in certain ways as a pre-condition of

6  conducting operations. For this reason, under the State Compulsion Test, Songwriters

7  seek a Declaratory Judgment that ASCAP & BMI and their Officials are State Actors

8  for civil rights purposes.

9  5.    ASCAP & BMI are compelled by the terms of the Consent Decree to collect

10  Performance Royalty money for any Songwriter with at least one published work.

11  Songwriters thus seek a Declaratory Judgment that collecting Performance Royalties is

12  a federally-protected statutory right, not a contractually-created right.

13  6.    For all intents and purposes, any Songwriter who seeks to earn Performance

14  Royalty money must sign with either ASCAP or BMI. Since both entities are operating

15  under an identical Consent Decree, the "choice" of "ASCAP vs. BMI" is a distinction

16  without a difference. Songwriters have no choice. Songwriters must either sign the

17  Writer "Agreement" with ASCAP & BMI, or else not ever collect Performance

18  Royalties. Any Songwriter who refuses to sign with ASCAP & BMI faces economic

19  ruin. For this reason, Songwriters seek a Declaratory Judgment that ASCAP & BMI's

20  Mandatory Arbitration Agreement is void for economic duress.

21  **D.    Alexander C. Baker and his Assignee Adam Bravery, LLC are**

22  **Viable Class Representatives**

23  7.    Songwriter Class Members are ASCAP & BMI writers with at least one

24  published song that generates Performance Royalties. Songwriter Class Representative

25  Alexander C. Baker is a composer, songwriter and music producer who has earned

26  upwards of $1 million in Performance Royalties for the use of his music on TV shows

27  over the last two decades. Baker originally signed with ASCAP in 1994, then moved to

28  BMI in 1999. Baker has earned royalties from both ASCAP & BMI in every

distribution quarter since. Assignee Class Representative Adam Bravery LLC is a Limited Liability Company to which Baker assigned the right to receive royalty payments.

8.      Baker believes that his interests are aligned perfectly with the interests of Songwriters in voiding the Mandatory Arbitration Clause, in obtaining a declaration that receiving Performance Royalties are a federal-protected right, in a declaration that ASCAP & BMI owe a fiduciary duty to Songwriters, and in holding ASCAP & BMI and their agents to be State Actors for civil rights purposes.

### E.      The Court Should Bifurcate the Class Action Case And Try It Purely As A Matter of Law

9.      Because they are not interested in Baker's underlying claims against BMI, but are very interested in Baker's Declaratory Judgment claims against ASCAP & BMI, Class Action Plaintiffs therefore request at the outset that the Court BIFURCATE these first five Declaratory Judgment actions, pleaded here as the First, Second, Third, Fourth and Fifth Causes of Action (collectively the "Class Action Case").

10.     Class Action Plaintiffs believe and on that basis allege that there are no material facts in dispute relevant to the Class Action Case. Based on the undisputed facts regarding the standard operating procedure of ASCAP & BMI, a dispute has now arisen as to the enforceability and/or constitutionality of various elements of that procedure. Regarding the Class Action Case, there is no need for any discovery by the Parties, nor any fact-finding by the Court.

11.     For the above reasons, Songwriters believe this Class Action Case can and should be brought to final judgment in short order. Despite more than 1 million class plaintiffs, *procedurally-speaking* this Class Action Case appears to be a very small and simple case. Because the Class seek only Declaratory Judgments, there is no procedural requirement to notify class members or give them the ability to opt out.

## II.    SHORT PLAIN STATEMENT OF THE UNDERLYING CASE

12.    BMI is legally obligated to pay Performance Royalties to Adam Bravery, LLC, the rightful assignee of BMI songwriter Alexander C. Baker. After paying royalties faithfully for over 20 years, BMI has stopped doing so without legal justification, but upon a false and fabricated pretext.

## III.    JURISDICTION

### A.    Federal Question Jurisdiction

13.    Class Plaintiffs assert original federal jurisdiction under 28 U.S.C. § 2201 et. seq., the Declaratory Judgment Act, as Songwriters seek Declaratory Judgments that the Mandatory Arbitration Clause is void for coercion; the Mandatory Arbitration Clause unconstitutionally violates Songwriters' federal rights to petition and to a jury trial; receiving Performance Royalties is a federally-protected right; ASCAP & BMI and its officials are State Actors for civil rights purposes; and that ASCAP & BMI owes a fiduciary duty to its writer members, who thereby have a right to audit.

14.    Federal jurisdiction is also asserted under 42 U.S.C. § 1983, the Civil Rights Act, as Plaintiffs seek to hold Defendants liable for civil rights violations.

15.    Furthermore, federal jurisdiction was expressly retained in the Consent Decree obtained in *United States v. BMI*, 64 Civ. 3787 (S.D.N.Y.).

### B.    Alexander Baker and Adam Bravery LLC Assert Diversity Jurisdiction

16.    In addition to federal question jurisdiction, Plaintiffs to the underlying action against BMI assert diversity jurisdiction.

17.    Plaintiff Adam Bravery LLC is a Limited Liability Company registered and headquartered in Arizona.

18.    Plaintiff Alexander C. Baker resides in California.

19.    Defendant ASCAP is a Delaware corporation, with headquarters in New York. Likewise, Defendant BMI is a Delaware corporation, with headquarters in New York.

On information and belief, Defendants Mike O'Neill and Erika Stallings each reside in New York.

20.     The value of Alexander Baker's BMI royalty stream in the underlying case was at least $100,000, rendered worthless by BMI's unjustified royalty stoppage. Class Plaintiffs.

21.     Additionally, Plaintiffs to the underlying case against BMI seeks general damages of not less than $1,000,000, and special damages of not less than $200,000.

22.     Therefore federal diversity jurisdiction is proper over all underlying claims by Plaintiffs Alexander C. Baker and Adam Bravery LLC.

## C.   Supplemental Jurisdiction

23.     The District Court should exercise supplemental jurisdiction over the State law claims because all of the claims arise from a common nucleus of operative facts that are so inextricably intertwined that they cannot reasonably be separated.

## IV.   VENUE

24.     Venue is proper in Arizona because that is the State in which Plaintiff Adam Bravery LLC is registered to do business. On information and belief regarding operative case law, Plaintiff Adam Bravery LLC is precluded from seeking relief in a Federal Court in any other State besides Arizona.

## V.   PARTIES

### A.   Plaintiffs

25.     Plaintiff and proposed Songwriter Class Representative Alexander C. Baker ("Baker") is an individual. Baker is a songwriter and music producer, and the aspiring producer of a music-driven animated entertainment franchise titled "Adam Bravery".

26.     The proposed Songwriter Class is all ASCAP & BMI writer members who signed the standard Writer "Agreement", and who wish to collect Performance

Royalties, but also wish to no longer be bound by the unenforceable, unconscionable and/or unconstitutional terms and conditions imposed upon them by ASCAP & BMI as a pre-condition, and about which Class Action Plaintiffs complain herein throughout.

27.    Plaintiff and proposed Assignee Class Representative Adam Bravery, LLC, is an Arizona Limited Liability Company formed by Baker and two other equal members in 2018, is the assignee and legal claimant to benefit from Alexander C. Baker's Performance Royalty money. The purpose of Adam Bravery LLC is to produce and commercially exploit a music-driven, animated motion picture authored by Baker, and to commercially exploit its associated music and merchandise.

28.    The proposed Assignee Class is all persons and entities to whom rights to receive Performance Royalties have been validly assigned, who wish to collect Performance Royalties, but also wish to no longer be bound by the unenforceable, unconscionable and/or unconstitutional terms and conditions imposed upon them by ASCAP & BMI as a pre-condition, and about which Class Action Plaintiffs complain herein throughout.

### B.    Defendants

29.    Defendant American Society of Composers, Authors and Publishers, commonly known as "ASCAP", is a Delaware nonprofit corporation with its principal office in New York.

30.    Defendant Broadcast Music Inc., commonly known as "BMI", is a Delaware nonprofit corporation with its principal office in New York.

31.    ASCAP & BMI are Performing Rights Organizations ("PRO") as set forth in the Copyright Act. and whose purpose is to collect and distribute music Performance Royalty money to its affiliated writer and publisher members.

32.    Defendant Mike O'Neill is the CEO of BMI, and sued in his individual capacity for involvement in the false pretext to withhold royalties (Claims 6-11).

33.    Defendant Erika Stallings is in-house counsel for BMI, and is believed to be personally responsible for issuing a false pretext on which to stop paying royalties to

Adam Bravery LLC. Stallings is sued in her individual capacity for her involvement in the false pretext to withhold royalties (Claims 6-11).

### C.  Doe Defendants

Doe Defendants are unknown BMI officials involved in authorizing, planning and executing the false pretext for withholding royalties (Claims 6-11).

## VI.  STANDING

### A.  Individual Standing for Plaintiff Alexander C. Baker

34.    Plaintiff Alexander C. Baker has standing to sue ASCAP & BMI for the Declaratory Judgments sought in the First – Fifth Causes of Action because he has suffered injury in fact – both constitutional and monetary injuries.

35.    As a direct and proximate consequence of Defendants' actions, Baker has suffered injuries in fact, which injuries are the loss of value of his share of ownership in Adam Bravery LLC, which loss in value was actually and proximately caused by the destruction of the federally protected right to receive Performance Royalty money, which right is presently held by Plaintiff Adam Bravery LLC.

36.    Baker seeks to vindicate his First Amendment right to petition and Seventh Amendment right to a jury trial, which rights are vigorously asserted here, but which rights ASCAP & BMI contend was "waived" by virtue of the Writer "Agreement" and its Mandatory Arbitration Clause.

37.    Baker seeks a Declaratory Judgment that ASCAP & BMI owe him a fiduciary duty.

38.    Baker's injuries are remediable by the Judicial Declarations sought, because finding the Mandatory Arbitration Clause void and/or unconstitutional, or finding performance royalties to be a federally protected right, or finding ASCAP & BMI and its officials to be State Actors would allow Adam Bravery LLC to recover damages, and recover the withheld royalty money, which would restore the lost value of the company.

### B.  Organizational Standing for Adam Bravery LLC

39.     Plaintiff Adam Bravery LLC has standing to pursue the Declaratory Judgments sought in the First – Fifth Causes of Action because it has suffered injury in fact. As Assignee, Adam Bravery LLC has the right to receive royalty money. Under the U.S. Constitution, Adam Bravery LLC has a right to petition the government for grievances, and a right to a jury trial, the loss of which rights constitutes injury. Moreover, the unjustified withholding Performance Royalty money is clear financial injury.

40.     Moreover, an association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 335, 97 S. Ct. 2434, 2437 (1977)

41.     Here, for the reasons set forth above, Alexander Baker has standing to sue in his own right for Declaratory Judgments and for civil rights violations. Though he assigned his federally-protected right to receive performance royalties to the LLC, he has a vested financial interest in the LLC as a 1/3 owner.

42.     Adam Bravery LLC seeks to protect its right to collect Performance Royalties, which is germane to its overall purpose for two reasons. First, it exists to create and commercially exploit copyrighted content, which commercial exploitation should in the future encompass receiving performance royalties. Second, and most pressingly, Adam Bravery LLC depends crucially on the quarterly income from ASCAP & BMI royalties in order to operate. While one member of Adam Bravery LLC – Baker – is party to this lawsuit, neither the Declaratory Judgment nor Civil Rights claims asserted nor the relief requested require the participation of the other members.

43.     Therefore, Adam Bravery LLC has standing to pursue Declaratory Judgment and Civil Rights claims because Defendants acted under color of law to deprive Adam Bravery LLC of its federally protected right to receive Performance Royalty money.

1  Defendants also acted to deprive Adam Bravery LLC of its First Amendment Right to

2  Petition, and Seventh Amendment right to a jury trial, which right is vigorously

3  asserted here.

4  **VII.    FACTS RELEVANT TO CLASS ACTION CLAIMS**

5        **A.    Background on ASCAP & BMI**

6  44.    Since well before World War II, ASCAP & BMI have operated as non-profit

7  organizations in the role of Performance Rights Society, or Performing Rights

8  Organization ("PRO") as set forth in the "Definitions" section of Copyright Act at 17

9  U.S.C. § 101.

10  45.    ASCAP & BMI enter into purported "contracts" with music publishers

11  ("publisher members") and music writers ("writer members") for the purpose of

12  collecting and distributing Performance Royalty money owed to them. Performance

13  Royalties are typically the only way a Songwriter can monetize.

14  46.    Musical artists and music publishers have other available modes of monetizing

15  the song besides Performance Royalties. But for the Songwriter who is not an artist and

16  not a publisher, the only method of monetizing the song is Performance Royalties.

17  47.    ASCAP & BMI enters into license agreements with music users such as

18  television networks, radio stations, nightclubs, and various other live and online

19  entertainment venues where music is heard. ASCAP & BMI charge a license fee in

20  exchange for granting the right to publicly "perform" the music written and published

21  by its members.

22  48.    ASCAP & BMI collect roughly $1 billion each in license fees on an annual basis.

23  ASCAP & BMI retain that license fee money for a period of time, typically for about

24  nine months, taking an unknown amount of the money for operating expenses. Then,

25  on a quarterly basis, in January, March, June and September of each year, ASCAP &

26  BMI distribute the remainder money as Performance Royalties, purportedly according

27

28

1  to a formula based on the results of performance surveys, and a weighting factor based
2  on the type of musical use.

3  49.    To the best of Plaintiffs' knowledge, ASCAP & BMI have never divulged their
4  "formula" by which Performance Royalties are calculated.

5  **B.    The Consent Decree**

6  50.    Long ago, ASCAP & BMI were prosecuted by the United States of America for
7  violations of the Sherman Anti-Trust Act. The net result of that prosecution was a
8  Consent Decree containing the terms and conditions under which ASCAP & BMI are
9  allowed to continue to operate.

10  51.    The Consent Decree is periodically renegotiated, or updated. On information and
11  belief, the most recent version of the Consent Decree controlling ASCAP & BMI is the
12  1994 version, a true and correct copy of which is attached to this complaint as
13  EXHIBIT "A", pp. 2-10.

14  52.    Under the Consent Decree, ASCAP & BMI have no right to refuse membership
15  to any Songwriter with at least one work published. At Article V (A) ("No Right to
16  Refuse"), the Consent Decree states, in relevant part:

17   "[ASCAP & BMI] shall not refuse to enter into a contract providing
18   for the licensing by [ASCAP & BMI] of performance rights with any
     writer who shall have had at least one copyrighted musical composition
19   of his writing commercially published or recorded..."

20  See EXHIBIT "A", p. 3

21  53.    The Consent Decree requires ASCAP & BMI to divest all songwriters of their
22  enumerated right to a jury trial. At Article VII (C) ("Arbitration Mandate"), the Consent
23  Decree states:

24   Defendant [ASCAP & BMI] shall include in all contracts which it
25   tenders to writers, publishers and music users relating to the licensing
     of performance rights a clause requiring the parties to submit to
26   arbitration in the City, County and State of New York under the then
     prevailing rules of the American Arbitration Association, all disputes of
27   any kind, nature or description in connection with the terms and
     conditions of such contracts or arising out of the performance thereof or
28

based upon an alleged breach thereof, except that in all contracts tendered by defendant to music users, the clause requiring the parties to submit to arbitration will exclude disputes that are cognizable by the Court pursuant to Article XIV hereof.

See EXHIBIT "A", p. 5

## C.    ASCAP & BMI Standard Writer "Agreement"

54.     Pursuant to their obligation under the Consent Decree, ASCAP & BMI offers potential writer-members a standard Writer "Agreement". In order to receive performance royalties, and having no meaningful alternative, like all Songwriter Class Members, Class Representative Alexander C. Baker signed such an "agreement" on June 4, 1999 (hereafter the "BMI-Baker Writer 'Agreement'"), attached to this Complaint at EXHIBIT "B", p. 12-15.

55.     At paragraph 13 ("Power of Attorney clause"), the BMI-Baker Writer "Agreement" states that:

You make, constitute and appoint us, or our nominee, your true and lawful attorney, irrevocably during the Period, in our name or that of our nominee, or in your name, or otherwise, in our sole judgment, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in our sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by you hereunder, and to recover damages in respect to or for the infringement or other violation of said rights, and in our sole judgment to join you and/or others in whose names the copyrights to any of the Works may stand.

EXHIBIT "B", p. 14

56.     At paragraph 17 ("Right to Payment of Money") the BMI-Baker Writer "Agreement" states:

You acknowledge that the rights obtained by you pursuant to this agreement constitute rights to payment of money and that during the Period we shall hold title to the performing rights granted to us hereunder.

EXHIBIT "B", p. 15

57.     At paragraph 18 ("Promise to Pay") the BMI-Baker Writer "Agreement" states:

> We agree to distribute to you royalties and monies collected by us pursuant to the authorization granted in subparagraph 18(a), pursuant to our then prevailing practices, including deduction of our expenses therefor.

EXHIBIT "B", p. 15

58.     At paragraph 19, ("Mandatory Arbitration Clause") the BMI-Baker Writer "Agreement" states:

> All disputes of any kind, nature or description arising in connection with the terms and conditions of this agreement shall be submitted to the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules.

EXHIBIT "B", p. 15

59.     The standard ASCAP & BMI Writer "Agreement" appears to have changed since 1999 when Baker signed his. On February 4, 2020, Baker downloaded from the BMI website its "Writer Kit", which contains the current standard "agreement" ("New Writer 'Agreement'") plus instructions on how to fill out the forms. The New Writer "Agreement" is attached hereto as EXHIBIT "C", pp. 16-23.

60.     In many respects, the new Writer "Agreement" is identical to the 1999 version that Baker signed. For example, the "Power of Attorney" language in paragraph 13 of the BMI-Baker Writer "Agreement" is found at paragraph 15 of the New Writer "Agreement"; EXHIBIT "C", p. 21; the "Right to Payment" language in paragraph 17 of the BMI-Baker Writer "Agreement" is now present in paragraph 19 of the New Writer "Agreement", Id, p. 22; the "Promise to Pay" language in paragraph 18 of the BMI-Baker Writer "Agreement" is now found at paragraph 20 of the New Writer "Agreement", Id, p. 22; and the Mandatory Arbitration Clause at paragraph 19 of the BMI-Baker Writer "Agreement" is now found at paragraph 21 of the New Writer "Agreement", Id, p. 22.

61.     However, the New Writer "Agreement" contains a significant difference as compared to the Writer "Agreement" Baker signed, as paragraph 24 of the current version ("No Fiduciary Duty") states:

> You acknowledge that the relationship between you and us which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

EXHIBIT "C", p. 22

62.    The "No Fiduciary Duty" language is not present in the BMI-Baker Writer "Agreement".

### D.    Background on Class Representative Alexander Baker

63.      Plaintiff Alexander C. Baker ("Baker") is a songwriter, lyricist and music composer. Primarily a pianist and keyboard player, Baker also plays guitar and percussion instruments. Baker can improvise music and spontaneously compose music, to specifications, "at the drop of a hat". This ability allowed Baker to be a very prolific composer.

64.    In 1993 Baker met Clair Marlo. Baker and Marlo formed a business partnership called "Invisible Hand Productions" for the purpose of writing, producing and commercially exploiting music.

65.    In 1995 Baker and Marlo were legally married.

66.    In 1999, Baker signed the ASCAP & BMI-Baker Writer "Agreement".

67.    In the ensuing 2 decades, Baker had literally thousands of performances of his music on TV. Baker never failed to earn royalties in any quarterly distribution since. By the year 2010, Baker's annual BMI royalties were over $100,000 per year.

68.    Since 2010, Baker's royalties have gradually tapered off, and currently earn about $40,000 per year.

///

# VIII.  CAUSES OF ACTION IN CLASS ACTION CASE

## FIRST CAUSE OF ACTION
### Declaratory Judgment – 28 U.S.C. § 2201
### ASCAP & BMI Mandatory Arbitration Clause is Void and Unenforceable
### Coercion / Economic Duress
### (Songwriter Class and Assignee Class v. ASCAP & BMI)

69.   Class Action Plaintiffs repeat, reallege, and incorporate by reference all facts stated above.

70.   Each member of the Songwriter Class undisputedly signed a document titled "Writer Agreement" with ASCAP and/or BMI, which document undisputedly contains a Mandatory Arbitration Clause, the language of which undisputedly purports to mandate arbitration for any dispute arising from the collection and distribution of performance royalties. Each member of the Assignee Class undisputedly assigned the rights to collect royalties under said Writer "Agreement".

71.   An actual controversy has arisen between Class Action Plaintiffs and ASCAP & BMI. Plaintiffs believe ASCAP & BMI's Mandatory Arbitration Clause is void and unenforceable because it was signed under coercion. ASCAP & BMI believe the Arbitration Clause is an enforceable agreement.

72.   Songwriters will be deemed to have been coerced into signing the ASCAP & BMI Writer "Agreement" if they can prove all of the following. (1) That ASCAP & BMI used a wrongful act or wrongful threat to pressure Songwriters into consenting to the contract; (2) that a reasonable person in Songwriter's position would have believed that they had no reasonable alternative except to consent to the ASCAP & BMI Writer "Agreement"; and (3) that Songwriter would not have consented to the contract without the wrongful act or wrongful threat. (See e.g. CACI Jury Instructions, No. 333)

73.   As with ASCAP, at paragraph 19, ("Mandatory Arbitration Clause") the BMI Writer "Agreement" states:

> All disputes of any kind, nature or description arising in connection
> with the terms and conditions of this agreement shall be submitted to

14

the American Arbitration Association in New York, New York, for arbitration under its then prevailing rules.

74.    Applicable case law instructs us that economic duress has taken place when "a reasonably prudent person subject to [economic coercion] may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." (*Rich & Whillock, Inc. v. Ashton Dev., Inc.,* 157 Cal. App. 3d 1154, 1155, 204 Cal. Rptr. 86, 87 (1984))

75.    Here, ASCAP & BMI's conduct clearly meets the standard for economic duress, because a typical Songwriter, e.g. Class Representative Alexander Baker, has no other method to obtain Performance Royalty money besides signing the Mandatory Arbitration Clause. Such a loss of Performance Royalties is reasonably expected to lead to financial ruin for a typical Songwriter, because a typical Songwriter works on a "work-for-hire" basis, or otherwise surrenders copyright ownership. As set forth in the Copyright Act (17 U.S.C. § 101 et. seq.), under a "work-for-hire", the songwriter gives copyright ownership – and all associated royalty rights - to the publisher. The only royalty right of any kind remaining to the songwriter under a work-for-hire is the right to collect Performance Royalties.

76.    Thus, to earn a living, a Songwriter has no reasonable alternative to ASCAP & BMI. It is either sign ASCAP & BMI's Mandatory Arbitration Clause, or face economic ruin. This is more than theory or speculation. After collecting royalties upwards of $1 million over the years, Class Representatives Alexander Baker and Adam Bravery LLC are now faced with economic ruin, as a direct and proximate consequence of BMI's unjustified royalty stoppage. Had Baker never signed the Mandatory Arbitration Clause in the first place, he could not possibly have ever received any of the money he did, and would have been economically ruined long ago.

77.    None of the Songwriters was party to the Consent Decree, thus could not possibly have agreed to any part of it. But ASCAP & BMI is clearly enforcing the terms of the Consent Decree against Songwriters. ASCAP & BMI must not be allowed

1   to enforce against Plaintiffs the terms of any agreement it entered into with the United

2   States of America, or with anybody else besides Songwriters.

3   78.    Songwriters' only "choice" in signing a contract to be paid Performance Royalties

4   was to either sign with ASCAP or with BMI. Both ASCAP & BMI are subject to

5   identical Consent Decrees, thus both are under orders to deny all Songwriters the

6   constitutional right to a jury trial. No Songwriter had any choice at all.

7   79.    Therefore, the Court should find that Songwriter's signature on ASCAP & BMI's

8   Mandatory Arbitration Clause was obtained by the coercion of economic duress, and

9   on that basis declare the ASCAP & BMI's Mandatory Arbitration Clause null, void and

10  unenforceable.

### SECOND CAUSE OF ACTION
### Declaratory Judgment – 28 U.S.C. § 2201
### ASCAP & BMI and Their Officials are Government Actors for § 1983 Purposes
### (Songwriter Class and Assignee Class v. ASCAP & BMI)

14  80.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

15  81.    An actual controversy has arisen, as Songwriters and their Assignees believe that

16  ASCAP & BMI and their Officials are State Actors for civil rights purposes, while

17  ASCAP & BMI maintain that they are private nonprofit organizations.

18  82.    ASCAP & BMI are each Delaware nonprofit corporations, with tax-exempt

19  status under IRC § 501(c)(3). ASCAP & BMI and its officers are nominally private

20  actors.

21  83.    However, ASCAP & BMI and their officers must be held to be government

22  actors for Section 1983 purposes, under the State Compulsion Test.

23  84.    Under the State Compulsion Test, a private actor will be treated as a government

24  official for Section 1983 purposes when a state exercises such coercive power that the

25  "choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991,

26  1004 (1982) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 166 (1978); *Jackson,*

27  419 U.S. at 357*; Adickes v. S.H. Kress & Co*., 398 U.S. 144, 170 (1970); *Moose Lodge*

28  *No. 107 v. Irvis*, 407 U.S. 163, 173(1965)).

85.    The State Compulsion Test is met when a state encourages or coerces a private party to engage in the challenged conduct.  See Paul C. McCaffrey, Note, Playing Fair: Why the United States Anti-Doping Agency's Performance-Enhanced Adjudications Should be Treated as State Action, 22 WASH. U. J.L. & POL'Y 645, 664 (2006).

86.    Here, the Consent Decree coerces ASCAP & BMI to collect royalties for "any writer", thus creating a federal entitlement and federal right. The choice in law is that of the United States of America, not of ASCAP & BMI. ASCAP & BMI has no choice in the matter.

87.    The Consent Decree also coerces ASCAP & BMI to deprive its members of the Seventh Amendment right to jury trial by mandating arbitration. Again, the choice in law is that of the United States of America, not of ASCAP & BMI. ASCAP & BMI has no choice in that matter either.

88.    Finding State compulsion is based on the degree of the state's influence over the private actor and, therefore, its potential application is much broader than, for example, the Public Function Test. As Justice Souter noted in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, coercion and encouragement refer to the "kinds of facts that can justify characterizing an ostensibly private action as public instead.' *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288,303 (2001).

89.    In light of the "any writer" mandate, the Consent Decree's degree of influence over ASCAP & BMI is *total,* as it states essentially *all* the significant terms under which ASCAP & BMI is and is not allowed to operate.

90.    Violations of the Consent Decree would subject ASCAP & BMI to punishment under the law. The Consent Decree compels ASCAP & BMI to act in certain way, and to refrain from acting in other ways, and has all the force and power of federal statutory law.

91.    Thus, the mandates of the Consent Decree satisfy the State Compulsion Test.

92.    Moreover, the Copyright Act (17 U.S.C. § 101 et. seq) mentions ASCAP & BMI *by name* in its definition section. Other than the Copyright Act, Plaintiffs are not aware

1  of any other statutes, federal or state, that mention any private entities, whether for

2  profit or nonprofit.

3  93.     Therefore, the Court should issue a Declaratory Judgment that, for Section 1983

4  purposes, ASCAP & BMI and its officials are State Actors.

5

6                              **THIRD CAUSE OF ACTION**

7  **42 U.S.C. § 1983 Civil Rights, 28 U.S.C. § 2201 Declaratory Judgment**
   **Consent Decree Arbitration Mandate and ASCAP & BMI Arbitration Clause**

8  **Violate Right to Petition and Right to Jury Trial Without Due Process**
   **(Songwriter Class and Assignee Class v. ASCAP & BMI)**

9

10  94.     Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

11  95.     An actual controversy has arisen between Class Action Plaintiffs and ASCAP &

12  BMI. Acting under color of the Consent Decree, Defendants have a policy and custom

13  of Mandatory Arbitration. Plaintiffs believe ASCAP & BMI's Mandatory Arbitration

14  Clause is unconstitutional because it deprives Plaintiffs of the rights to petition and to a

15  jury trial without the due process promised in the Fifth Amendment. ASCAP & BMI

16  believes its Mandatory Arbitration Clause is an enforceable agreement, and that

17  Songwriters voluntarily waived their constitutional rights.

18  96.     The First Amendment to the U.S. Constitution states, in relevant part:

19          Congress shall make no law … abridging … the right … to petition the
20          Government for a redress of grievances.

21  97.     The Seventh Amendment to the U.S. Constitution states:

22          In Suits at common law, where the value in controversy shall exceed
            twenty dollars, the right of trial by jury shall be preserved, and no fact
23          tried by a jury, shall be otherwise reexamined in any Court of the
            United States, than according to the rules of the common law.
24
            The Fifth Amendment to the U.S. Constitution states, in relevant part:
25
            No person … shall be deprived of … property … without due process
26          of law.
27          Procedural due process rules are meant to protect persons from the mistaken or
28  unjustified deprivation of life, liberty, or property. (*Carey v. Piphus*, 435 U.S. 247, 259

1   (1978)). Thus, the required elements of due process are those that "minimize

2   substantively unfair or mistaken deprivations" by enabling persons to contest the basis

3   upon which a State Actor proposes to deprive them of protected interests. (*Fuentes v.*

4   *Shevin*, 407 U.S. 67, 81 (1972)).

5   98.    In its Section VII (C), the Consent Decree states:

6          "[ASCAP & BMI] shall include in all contracts which it tenders to
7          writers, publishers and music users relating to the licensing of
           performance rights a clause requiring the parties to submit to arbitration
8          in the City, County and State of New York under the then prevailing
           rules of the American Arbitration Association, all disputes of any kind,
9          nature or description in connection with the terms and conditions of
           such contracts or arising out of the performance thereof or based upon
10         an alleged breach thereof..."

11  99.    At paragraph 19, ("Mandatory Arbitration Clause") the BMI-Baker Writer

12  "Agreement" states:

13         All disputes of any kind, nature or description arising in connection
14         with the terms and conditions of this agreement shall be submitted to
           the American Arbitration Association in New York, New York, for
15         arbitration under its then prevailing rules.

16  100.   Mandating arbitration is, by definition, a prior restraint of the right the petition

17  and of the right to a jury trial. It has long been established that a prior restraint comes to

18  the Court "with a heavy presumption against its constitutional validity." (*Bantam Books*

19  *v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). *Procter &*

20  *Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996)).

21  101.   Thus, the Court should immediately find that the burden of proof is on ASCAP

22  & BMI to demonstrate the constitutional validity of its Mandatory Arbitration Clause,

23  and that such is a heavy burden.

24  102.   Citing the U.S. Supreme Court's *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S.

25  750, 752, 108 S. Ct. 2138, 2141 (1988) ("Lakewood"), the Eleventh Circuit recently

26  explained the impermissible nature of unbridled discretion in issuing a prior restraint,

27  which explains why ASCAP & BMI's Mandatory Arbitration Clause must be struck

28  down:

> Perhaps the plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to [allow or disallow speech] but that provides no standards by which the official's decision must be guided.
>
> (*Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017))

If we look to the plain language of the Consent Decree, which has all the force of federal statutory law, there is no standard by which ASCAP & BMI has any discretion as to when the songwriter's First Amendment right to petition may or may not be restrained. Rather, the Songwriter's constitutional rights are simply done away with. Thus, ASCAP & BMI's Mandatory Arbitration Clause is worse than "unbridled discretion" to destroy rights, it is the ex ante wholesale destruction of rights, with no exercise of discretion required.

103.    ASCAP & BMI's Mandatory Arbitration Clause was obtained by the coercion of economic duress, because Songwriters had no reasonable alternative in the matter. *Supra.*

104.    The present deprivation of Class Action Plaintiffs' constitutional rights to petition and to a jury trial must be considered unfair and/or mistaken, because the Consent Decree and ASCAP & BMI's Mandatory Arbitration Clause purports to ex ante deny Songwriters the First Amendment right to petition the government for redress of grievances, and of the Seventh Amendment right to a jury trial, prior to the songwriter even contemplating such a thing as performance royalties. Indeed, the deprivation of rights occurred prior to most Songwriters alive today having even been born.

105.    "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. "*Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950)"

106.   No Songwriter here was party to the Consent Decree, thus was not apprised of the pendency of the action and not afforded any opportunity to present objections. There was no notice to the Songwriters that their rights to petition and to a jury trial were at stake, or that by executing the Consent Decree the right to petition and to a jury trial would forever be lost. Defendants cannot even reasonably argue that Plaintiffs were afforded due process, let alone could it be proven.

107.   Therefore, the Court should issue a Declaratory Judgment striking ASCAP & BMI's Mandatory Arbitration Clause as unconstitutional. The Court should find that ASCAP & BMI's Mandatory Arbitration Clause, and the Consent Decree arbitration mandate underlying it, constitute an impermissible prior restraint of the First Amendment right to petition, and of the Seventh Amendment right to a jury trial, and that such prior restraint was imposed upon Plaintiffs without affording them the substantive and procedural due process guaranteed by the Fifth and/or Fourteenth Amendment.

**FOURTH CAUSE OF ACTION**
**Declaratory Judgment – 28 U.S.C. § 2201**
**Collecting Performance Royalties is a Federal Right**
**Regardless of Whether ASCAP & BMI Are State Actors**
**(Songwriter Class and Assignee Class v. ASCAP & BMI)**

108.   Class Action Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

109.   And actual controversy has arisen, as Songwriters and their Assignees believe that collecting Performance Royalties is a federally-protected statutory right, whereas ASCAP & BMI believe the collecting Performance Royalties is a contractual right only.

110.   The Consent Decree has all the force and power of federal statutory law. At Article V (A) ("No Right to Refuse"), the Consent Decree states, in relevant part:

> "[ASCAP & BMI] shall not refuse to enter into a contract providing
> for the licensing by [ASCAP & BMI] of performance rights with ***any***

*writer* who shall have had at least one copyrighted musical composition of his writing commercially published or recorded..."

See EXHIBIT "A", p. 2, emphasis added.

111.   Clearly the United States intended the Consent Decree to operate as federal law, and to establish a federal entitlement to collect performance royalties. Otherwise, the United States would not have mandated that ASCAP & BMI collect and distribute royalties to "any writer".

112.   The Supreme Court has consistently held that a federal entitlement creates a federal right. For example, a person's entitlement to welfare benefits under the federal Social Security Act is a federal right stemming from a federal statute that can be protected by section 1983. See *Maine v. Thiboutot*, 448 U.S. 1, 100 S. Ct. 2502, 65 L. Ed. 2d 555 (1980) ("*Thiboutot*").

113.   In *Thiboutot, supra,* the Supreme Court contended with the issue of the scope of coverage under Section 1983. The Court began by quoting the text from 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution *and laws*, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

*Thiboutot*, *supra,* at 2504, emphasis in original.

114.   The Supreme Court then explained the large applicability of Section 1983:

Even were the language [of Section 1983] ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law. *Rosado v. Wyman*, 397 U.S. 397 (1970), for example, "held that suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating States." *Edelman v. Jordan*, 415 U.S. 651, 675 (1974). *Monell v. New York* City Dept. of Social Services, 436 U.S. 658, 700-701 (1978), as support for its conclusion that municipalities are "persons" under § 1983, reasoned that "there can be no doubt that § 1 of the Civil Rights

Act [of 1871] was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." Similarly, *Owen v. City of Independence*, 445 U.S. 622, 649 (1980), in holding that the common-law immunity for discretionary functions provided no basis for according municipalities a good-faith immunity under § 1983, noted that a court "looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes." *Mitchum v. Foster*, 407 U.S. 225, 240, n. 30 (1972), and *Lynch v. Household Finance Corp.*, 405 U.S. 538, 543, n. 7 (1972), noted that § 1983's predecessor "was enlarged to provide protection for rights, privileges, or immunities secured by federal law." *Greenwood v. Peacock*, 384 U.S. 808, 829-830 (1966), observed that under § 1983 state "officers may be made to respond in damages not only for violations of rights conferred  by federal equal civil rights laws, but for violations of other federal constitutional and statutory rights as well."

*Thiboutot*, *supra,* at 2504-05

115.    Thus, the Court must find that the Consent Decree mandate that ASCAP & BMI collect and pay performance royalties to "any writer" creates a federal right in the Songwriter.

116.    Because there is no language prohibiting assignment of rights to collect royalties, and indeed ASCAP & BMI have a standard form to facilitate assignment of royalties, the federal right to receive performance royalties must extend to Assignees.

117.    Therefore, the Court should issue a Declaratory Judgment that a songwriter with at least one published musical composition of his or her writing has a federally protected right to collect performance royalties, and that such federal right extends to assignees.

## FIFTH CAUSE OF ACTION
### Declaratory Judgment – 28 U.S.C. § 2201
### ASCAP & BMI Owes a Fiduciary Duty to Writers and Their Assignees
### Regardless of Whether ASCAP & BMI Are State Actors
### (Songwriter Class and Assignee Class v. ASCAP & BMI)

118.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

119.    An actual controversy has arisen between Class Action Plaintiffs and ASCAP & BMI. Plaintiffs contend that ASCAP & BMI owes a fiduciary duty to all its Songwriter

members, and to their Assignees. ASCAP & BMI contend they do not owe any fiduciary duty to its Songwriters or their Assignees.

120.    The standard ASCAP & BMI Writer "Agreement" explicitly makes ASCAP & BMI the member's attorney-in-fact, providing that:

> "You make, constitute and appoint us [ASCAP & BMI], or our nominee, your true and lawful attorney, irrevocably during the Period, in our name or that of our nominee, or in your name, or otherwise, in our sole judgment, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in our sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by you hereunder..."

121.    An attorney is a fiduciary, by definition.

122.    Under the standard ASCAP & BMI Writer "Agreement", the responsibilities of ASCAP & BMI are closely akin to those of an escrow officer: ASCAP & BMI promise to collect Performance Royalty monies due to the Songwriter, to hold that money for some period of time, to deduct its own expenses, then calculate the amount due to each Songwriter, then to pay. An escrow officer is a fiduciary, by definition.

123.    ASCAP & BMI's responsibilities are also very closely akin to those of a trustee obligated to make regular distributions to a number of similarly-situated beneficiaries. A trustee is a fiduciary, by definition.

124.    Because they are entrusted to collect, hold and fairly distribute Songwriters' money, the relationship between ASCAP & BMI and the Songwriter is the very *essence* of a fiduciary relationship.

125.    Therefore the Court should issue a Declaratory Judgment that the relationship between a songwriter with a performing rights society, as defined in 17 U.S.C. § 101, is a fiduciary relationship. This fiduciary relationship must extend to any subsequent assignees of rights to receive royalty money. The Court should explicitly define that fiduciary duty to include the right to audit, and to make public the formula by which royalties are allocated amongst Songwriters.

## IX.    PRAYER FOR RELIEF ON CLASS ACTION CLAIMS

126.    Wherefore, Class Action Plaintiffs pray for relief as follows:

### A.    Declaratory Relief

For a Declaratory Judgment that the Mandatory Arbitration Clause within the Writer "Agreement" of ASCAP & BMI is void for economic duress;

For a Declaratory Judgment that, for purposes of Section 1983 litigation, ASCAP & BMI is a government entity and its officials are government actors;

For a Declaratory Judgment that the Arbitration Mandate in the Consent Decree and in the standard ASCAP & BMI Writer "Agreement" violates the First Amendment right to petition and the Seventh Amendment right to a jury trial;

For a Declaratory Judgment that any songwriter with at least one song published has a federally-protected right to collect Performance Royalties, and that such federal right is assignable; and

For Declaratory Judgment that ASCAP & BMI owes Songwriters and their Assignees a fiduciary duty, with rights to audit;

### B.    Injunctive Relief

For a permanent injunction prohibiting ASCAP & BMI from disclaiming a fiduciary duty to its Songwriter members and their Assignees;

For a permanent injunction prohibiting ASCAP & BMI from compelling arbitration as a precondition of collecting Performance Royalties for Songwriters;

### C.    Costs and Fees

For the cost of the suit plus pre-judgment interest;

For attorney fees as allowed by statute and/or by contract; and

For any other such relief as the Court may deem appropriate.

## X.    DEMAND FOR COURT TRIAL ON CLASS ACTION CLAIMS

127.    Class Action Plaintiffs hereby demand a Court trial on claims 1-5.

## XI.   FACTS RELEVANT TO ALEXANDER BAKER'S UNDERLYING CASE AGAINST BMI

### A.   The Baker-Marlo Divorce, Stipulation and Royalty Order

128.   In June 2014, Alexander Baker ("Baker") filed for divorce from his wife and business partner Clair Marlo ("Marlo"). The divorce proceeding is Los Angeles Superior Court, Case. No. LD068701 ("Baker Family Law Case").

129.   On July 7, 2016, Baker and Marlo stipulated and the Family Court ordered that music royalties be equalized between them for all songs created after January 11, 1995 (the date of marriage) and before April 7 2015 (putative date of separation), (Royalty Reallocation Order).  The Family Court Stipulation and Order is attached to the Complaint as EXHIBIT "D", pp. 25-27.

130.   To effectuate the Royalty Reallocation Order, Baker and Marlo were instructed to draft and submit to all royalty-paying entities a Letter of Direction, instructing each entity to reallocate the royalties. Baker and Marlo quickly realized that determining the date of creation for each of thousands of songs was impossible, and decided to instead use date of registration, which is a record known to be kept by all royalty-paying entities. Reasoning that it typically takes 4-6 weeks for a song to be registered after submitting that song to the record company, Baker and Marlo agreed to use the date of June 1, 2015 as the cutoff date for inclusion in the royalty reallocation.

131.   On July 18, 2016, Baker and Marlo jointly signed and mailed Letters of Direction to royalty-paying entities, including ASCAP & BMI, instructing them to equalize the music royalties on all music registered after January 11, 1995 and before June 1, 2015. See EXHIBIT "E", p. 29.

132.   BMI complied with the Letter of Direction, and did reallocate the royalties as equal between Baker and Marlo. Beginning with the September 2016 distribution, and continuing unabated until March of 2020, BMI made equal payments to Baker and Marlo.

**B.    Baker's Assignment of Royalties to the LLC**

133.    In or about September 2016, on the advice of his tax preparer, Baker formed Write Hear, LLC, a single-member Limited Liability Company. The purpose of Write Hear, LLC was to write, produce and commercially exploit music, and to obtain a more favorable tax treatment. Baker timely notified Marlo on the formation of Write Hear LLC within the Family Court disclosure process.

134.    On April 12, 2017, on advice of his tax preparer, Baker assigned his BMI royalty stream to Write Hear, LLC, which company paid Baker a salary. Baker used BMI's standard assignment form for the assignment. Baker timely notified Marlo about the assignment of royalties to Write Hear LLC within the Family Court disclosure process. See EXHIBIT "F" attached hereto.

135.    Beginning with the June 2017 distribution, ASCAP & BMI paid the royalties to Write Hear LLC.

136.    During the summer of 2017, Baker decided to embark on the creation of an animated, music driven show called "Adam Bravery". Write Hear LLC hired numerous independent contractors toward the goal of producing the show, including illustrators, animators, writers and musicians.

137.    In or about April 2018, Baker persuaded two other individuals – Lisa Margulies and Chris Gebbia – to partner with him in the creation of the Adam Bravery show. Margulies had a financial background and also had connections in the animation world. Gebbia had a music background and was willing to put in long hours of creative work.

138.    In May of 2018, Baker and his two partners formed Adam Bravery, LLC, an Arizona Limited Liability Company. Prior to dissolving Write Hear LLC, all assets of Write Hear LLC, including equipment and numerous work-for-hire contracts, were assigned from Write Hear LLC to Adam Bravery LLC.

139.    On July 9, 2018, Baker's BMI royalties were assigned from Write Hear LLC to Adam Bravery LLC. The same standard BMI royalty assignment form was used for the assignment as before. Baker timely notified Marlo regarding the assignment of assets,

1    including the assignment of royalties, from Write Hear LLC to Adam Bravery LLC

2    within the Family Court disclosure process. See EXHIBIT "G".

3    140.    Beginning with the September 2018 distribution, BMI paid Adam Bravery, LLC.

4        **C.    BMI and Erika Stallings Fabricate a False "Dispute" and**
             **Repeatedly Threaten to Stop Paying Royalties**
5

6    141.    In the week prior to July 16, 2019, Marlo's attorneys Mike DiNardo and Joe

7    Yanny contacted Erika Stallings and devised a plan to inflict emotional and financial

8    distress upon Baker, for the purpose of defeating him in court. Under the plan, BMI

9    would withhold paying Baker's share of royalties to Adam Bravery LLC, while

10    continuing to pay Marlo's share of the royalties to Marlo.

11    142.    Plaintiffs have no direct knowledge of any bribes or kickbacks paid to Erika

12    Stallings. However, insofar as BMI has certainly stopped paying royalties without legal

13    justification, and Erika Stallings has certainly concocted a false pretext on which to

14    stop paying, it is a reasonable inference that, in exchange for cooperation, Marlo pays

15    Erika Stallings money as a bribe or kickback, in an amount and by methods to be

16    proven to the jury at trial.

17    143.    At all relevant times, Defendants knew that the BMI royalties are crucial to the

18    operation of Adam Bravery LLC, including the payment of Baker's salary, his source

19    of livelihood.

20    144.    On July 16, 2019, BMI counsel Erika Stallings emailed Baker stating:

21        I am writing with respect to the July 7, 2016 order from the Superior
        Court of California regarding the terms of your divorce with Clair
22        Marlo. Pursuant to that order, all works created between November 11,
        1995 [sic] through April 7, 2015 are to be split 50/50 and both parties
23        agreed to not to make any deals with any third parties regarding the
        aforementioned works. You assigned your share of the works [sic] to
24        Adam Bravery LLC which is owned by you and three other individuals
        [sic] which is seemingly in violation of the terms of the order. Please
25        advise as to your position. If you have legal counsel in this matter
        please forward me their contact information.
26

27    EXHIBIT "H", p. 39

28

145.    Besides getting the date wrong (begin date of royalty reallocation is January 11, 1995, not November 11, 1995), and the number of partners wrong (Baker has two other partners, not three), the July 16, 2019 BMI email was false in one very important, material respect: No "share of the works" was assigned.

146.    A musical "work" is defined in the Copyright act, and refers to the ownership of copyright. See 17 U.S.C. § 101 et. seq.

147.    The Royalty Reallocation Order states that:

> Neither party shall sell, transfer, assign, or make any deal whatsoever with any third party **for any work** created 1-11-95 through 4-7-15 without the written consent of the other party or court order.

EXHIBIT "D", pp. 25-26, bolding added.

148.    Under the copyright act, it is valid to assign works, i.e. to assign copyright ownership. Indeed, on the vast majority of royalty-earning musical compositions at issue between Baker and Marlo, the copyright is not owned by Baker or Marlo, rather it is owned by a third-party record company.

149.    At no time did Baker, whether acting as an individual, or on behalf of any LLC, ever sell, transfer, assign or make any deal whatsoever with any third party for any work created 1-11-95 through 4-7-2015. The ownership of all works at issue is identical now as before.

150.    What Baker did do was assign his own share of the court-equalized Performance Royalty money to pay into a different bank account. Before, Baker's royalties paid into Baker's personal bank account. After the first assignment, the royalties paid into the Write Hear LLC bank account. After the July 2018 assignment, the royalties paid into the Adam Bravery LLC bank account. None of these assignments affected Marlo in any way, shape or form.

151.    A Performance Royalty is not a work.

152.    A work is not a Performance Royalty.

153.    In July 2019, and at all relevant times, BMI and Mike O'Neill and Erika Stallings and each of them understood and appreciated the distinction between "work" and

"royalty". BMI and Mike O'Neill and Erika Stallings and each of them knew that the statement "You assigned your share of the works to Adam Bravery LLC…" was false.

154.   The assignments of royalties from Baker to Write Hear LLC, and from Write Hear LLC to Adam Bravery LLC did not affect Marlo in any way, nor did it affect the Family Court's ability to reallocate the royalties again, should it choose to do so. Regardless of who BMI is paying Baker's royalties to, any future reallocation would take place at BMI, just as it did in July 2016 when the royalties were reallocated the first time.

155.   On August 21, 2019, Baker and Marlo received a letter from BMI counsel Erika Stallings entitled "Broadcast Music Inc. Royalties", attached hereto as EXHIBIT "I", p. 41. This letter begins by falsely stating:

> BMI was recently made aware of a July 7, 2016 order issued by the Superior Court of California, County of Los Angeles (the "Order") relating to musical works written during your marriage.

EXHIBIT "I", p. 41.

156.   In fact, BMI was aware of the Order in July 2016, because the Letter of Direction, which BMI undisputedly complied with, begins with "Pursuant to July 7, 2016 Orders of the Court in Los Angeles Superior Court case LD068701…" See EXHIBIT E, p. 29.

157.   BMI's August 21, 2019 letter is also deceptive in that it does not refer to a royalty reallocation, but rather to an order "relating to musical works". EXHIBIT "I", p. 41. BMI and Mike O'Neill and Erika Stallings and each of them were acting with malice in willfully attempting to deceive, not only Baker, but also the Court, into falsely believing that Baker assigned works, when Baker provably did no such thing.

158.   The only reasonable inference from these facts is that BMI and Mike O'Neill and Erika Stallings and each of them conspired and colluded with Marlo and her attorneys to intentionally injure Baker and Adam Bravery LLC.

159.   BMI's August 21, 2019 letter states:

1

2

3

4

    In 2018, Mr. Baker transferred his BMI royalties for the above referenced works to Adam Bravery, LLC, a multimember LLC. Ms. Baker has alleged that this transfer is in violation of the Order. Mr. Baker's position is that the transfer was merely a transfer of payment of royalties, not a transfer of the works and that no violation of the Order has occurred.

5

6

7

    As this is now a disputed matter between the parties, please be advised that unless the parties come to a resolution of this matter by September 5, 2019, BMI will be placing the disputed royalties on withhold and will proceed with filing a third party interpleader action to deposit the royalties with the court until the dispute is resolved.

8

EXHIBIT "I", p. 41.

9

10

160.    BMI has a standard dispute hold policy, which states in relevant part that:

11

12

    BMI will withhold royalties earned by any works that are the subject of litigation, upon receipt of a copy of the complaint as filed with the court and a written directive to BMI from the court requiring such withholding.

13

EXHIBIT "J", pp. 45-46

14

15

16

161.    If there was any "dispute" as to the proper payee of Baker's BMI royalty stream, that dispute would be between Baker and Adam Bravery LLC. Nothing Baker did affected Marlo's royalties in any fashion.

17

18

19

20

21

22

162.    As of September 2019, no complaint or any dispute had been filed by Marlo. Any legitimate dispute hold would stop all royalties payable on the works, according to policy. Here, BMI threatened to stop royalties paid to Baker, while continuing to pay Marlo. The only reasonable inference from this fact is that BMI and Mike O'Neill and Erika Stallings and each of them have the requisite state of mind to constitute actual malice toward Plaintiffs.

23

24

25

26

27

163.    By September 5, 2019, per BMI's request, Baker and Marlo did not reach any agreement about the supposed "dispute". Baker and Marlo could not possibly have reached any agreement about the supposed "dispute", because there was no dispute regarding the proper allocation and payment of BMI royalties on which Baker and Marlo could either agree or disagree.

28

164.    The July 7, 2016 stipulation and order of the Family Court mandates that royalties are 50-50 between Baker and Marlo, and, as of this writing, no order has superseded it.

165.    Despite BMI's threat to withhold royalties, on September 20, 2019 BMI royalty money was paid to Adam Bravery LLC.

166.    On September 26, 2019, BMI outside counsel AnnMarie Mori sent Baker an email asking him to stipulate that he and Marlo had a dispute, evidently in an effort to justify BMI withholding the money. Baker responded, in relevant part, as follows:

> I've never heard of stipulating to a dispute. That's agreeing to disagree, which is the same as no agreement. I don't understand why you are representing [Marlo]. I do know that neither she nor any of her attorneys has ever once contacted me on this issue, so that's strange. I do not know that [Marlo] disputes the propriety of the assignments, I only know that Erica[sic] Stallings and AnnMarie Mori represent that [Marlo] disputes the assignments. I have never been served with any court document that indicates that she disputes this, and, frankly Ms. Mori, I don't believe you. The reason I don't believe you is that you lied about being unaware of the Order. Do you have any evidence that [Marlo] disputes the assignment?

EXHIBIT "K", p. 49.

167.    BMI did not respond any further to the September 26, 2019 email thread.

### D.    Marlo Files Meritless Contempt Action Which is Dismissed

168.    On October 2, 2019, by and through attorney Joe Yanny, Marlo filed a Contempt action in Family Court, alleging that the assignment of royalties violated the court order. EXHIBIT "L", pp. 52-69. According to plan, Marlo's Contempt action mimicked BMI's false contention that Baker has assigned "copyright", or assigned "works", when in fact Baker assigned royalties. Marlo sought severe penalties against Baker, alleging that:

> Each song is a separate violation of the Court Order. I ask the Court to impose fines of $1,000 for each of the 3,000 plus songs that were transferred, for Contempt of Court and to impose jail time to [Baker] of up to five days for each violation.

EXHIBIT "L", p. 69.

169.    On October 7, 2019, BMI wrote a letter to Both Marlo and Baker, stating that they had received notice of Marlo's Contempt action filed against Baker, and noting that said Contempt action:

> …sets forth Ms. Marlo's contention that the that the 4/2017 assignment by Mr. Baker of his royalties to Write Hear, LLC, and the subsequent 7/2018 assignment of royalties by Mr. Baker on behalf of Write Hear, LLC to Adam Bravery LLC violated the July 2016 Court Order issued in the marital dissolution action.

EXHIBIT M, p. 71.

170.    BMI's October 7, 2019 letter also states:

> Please be advised that BMI has placed a hold on the Assigned Royalties pending an order of the Court resolving the dispute or the written agreement of the parties as to the disposition of the Assigned Royalties.

EXHIBIT M, p. 71.

171.    Immediately thereafter, on or about October 10, 2019, the other members of Adam Bravery LLC fired Baker from his full time job.

172.    On November 7, 2019, the Family Court issued an order dismissing Marlo's Family Law Contempt action under Cal. Penal Code § 1385. EXHIBIT "N", p. 74.

173.    At the November 7, 2019 Contempt hearing, parties had been sworn in, thus jeopardy attaches and the Contempt action cannot be refiled. A dismissal of a Contempt action is non-appealable order under California law.

## E.    BMI Officially Imposes Dispute Hold, But Then Pays Again Anyway

174.    After the November 7, 2019 dismissal of Marlo's Contempt action, Baker contacted BMI and demanded that they lift the dispute hold. However, BMI indicated that they would maintain the dispute hold.

175.    Nevertheless, on January 20, 2020, BMI paid Adam Bravery LLC the royalties per the usual January distribution.

### F. BMI Stops Paying Royalties

176.    On March 18, 2020, Adam Bravery LLC bank account received the BMI royalties as per the usual March distribution, in the amount of $9,243.31.

177.    However, shortly thereafter, on March 18, 2020, BMI reversed the deposit, and electronically removed $9,243.31 from the Adam Bravery LLC bank account.

178.    On June 11, 2020, BMI failed to pay $9,911.00 owed to Adam Bravery, LLC.

179.    On September 10, 2020, BMI failed to pay $9,342.68 owed to Adam Bravery, LLC.

180.    To date (November 2020), BMI has failed to pay a total of $28,496.99.

## XII.    CAUSES OF ACTION IN UNDERLYING CASE

### SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Deprivation of Federal Right to Collect Performance Royalties
### (Alexander C. Baker and Adam Bravery LLC v. BMI)

181.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

182.    Under the State Compulsion Test, BMI and Erika Stallings and Mike O'Neill are State Actors for civil rights purposes. *Supra*. Baker had a federally-protected right to collect performance royalties, *supra,* which right was validly assigned to Adam Bravery LLC.

183.    Acting under color of the Consent Decree, which is federal law, BMI and/or Erika Stallings and/or Mike O'Neill intentionally denied Adam Bravery LLC the Performance Royalty money that it has a federal right to collect. BMI and/or Erika Stallings and/or Mike O'Neill knew that there is no "dispute" between Marlo and Baker upon which to base any sort of "Dispute Hold", and he, she or they decided to withhold funds anyway.

184.    Plaintiffs believe, and on that basis allege, that BMI has a policy and custom allowing for the fabrication of a false pretext on which to impose a "dispute hold", and

1   that Erika Stallings and/or Mike O'Neill and/or Does are responsible for implementing
2   that policy on an ad hoc basis.

3   185.   Alternatively, Plaintiffs allege that Erika Stallings and/or Mike O'Neill and/or
4   Does acted without authorization in fabricating the false pretext under which BMI
5   royalties were stopped.

6   186.   BMI and/or Erika Stallings and/or Mike O'Neill knew that Baker depends on the
7   royalties for his livelihood, because Baker told Erika Stallings so in a phone call on or
8   about July 2019. Similarly, BMI and/or Erika Stallings and/or Mike O'Neill knew that
9   Adam Bravery LLC depends on the royalties for its operation and continued existence.
10  BMI and/or Erika Stallings and/or Mike O'Neill knew that withholding royalties would
11  greatly diminish the market value of Adam Bravery LLC, and would injure Baker.

12  187.   On March 18, 2020, under direction of Erika Stallings, BMI failed to pay
13  $9,243.31. To date, ASCAP & BMI failed to pay a total of $28,496.99.

14  188.   Adam Bravery LLC was harmed by BMI's failure to pay $28,496.99 so far, and
15  will continue to be harmed for every subsequent payment missed.

16  189.   Baker has on several occasions had communications with an individual working
17  for a company called "Royalty Exchange". Royalty Exchange is in the business of
18  brokering the auction sales of royalty streams, such as Baker's. Royalty Exchange
19  estimated that Baker's royalty stream might fetch $150,000 at auction, and suggested
20  setting that as a reserve price.

21  190.   BMI official Erika Stallings and/or Mike O'Neill, each State Actors for Section
22  1983 purposes, intentionally deprived Plaintiffs of their federally-protected right to
23  collect performance royalties. At minimum, Erika Stallings and/or Mike O'Neill acted
24  with a reckless disregard Plaintiffs' federally protected rights.

25  191.   As a direct and proximate result of the deprivation of civil rights, Plaintiffs are
26  injured in the amount of royalties withheld to date, and/or the loss of value of the
27  business.

28

HOLD ASCAP & BMI ACCOUNTABLE - CLASS ACTION COMPLAINT

192.    Therefore, BMI, Erika Stallings and Mike O'Neill are jointly and severably liable to Plaintiffs for Civil Rights violations.

## SEVENTH CAUSE OF ACTION
### Breach of Contract
### (Adam Bravery, LLC v. BMI)

193.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

194.    If for whatever reason BMI and its officials are not held to be State Actor, or Plaintiffs right to receive royalties is not held to be a federally-protected right, then without waiving the right to present the legal claims set forth above and below, Plaintiffs *alternatively* present a Breach of Contract theory, i.e. an alternative to Deprivation of Civil Rights.

195.    In 1999, Baker and BMI entered into the BMI-Baker Writer "Agreement", a binding contract obligating BMI to pay performance royalties to Baker. At all relevant times prior to March 2020, Baker and BMI performed under the contract.

196.    In July 2016, Baker and co-writer Marlo instructed BMI to equalize royalties between them for all works registered after January 11, 1995 and before June 1, 2015. BMI complied with the reallocation. At all relevant times prior to March 2020, Baker and ASCAP & BMI performed under the modified contract.

197.    In April 2017, with BMI's consent, Baker validly assigned the right to receive royalties to Write Hear LLC. At all relevant times prior to March 2020, Write Hear LLC and BMI performed under the modified contract.

198.    In July 2018, with BMI's consent, Write Hear LLC validly assigned the right to receive royalties to Adam Bravery LLC. At all relevant times prior to March 2020, Adam Bravery LLC and BMI performed under the modified contract.

199.    The BMI-Baker Writer "Agreement" constitutes the "rights to payment of money", which right to be paid is validly held by Adam Bravery LLC.

200.    To date, BMI failed to pay a total of $28,496.99.

201.    Adam Bravery LLC was harmed by ASCAP & BMI's failure to pay $28,496.99 so far, and will continue to be harmed for every subsequent payment missed.

202.    Baker has on several occasions had communications with an individual working for a company called "Royalty Exchange". Royalty Exchange is in the business of brokering the auction sales of royalty streams, such as Baker's. Royalty Exchange estimated that Baker's royalty stream might fetch $150,000 at auction, and suggested setting that as a reserve price.

203.    As a direct and proximate result of BMI's having stopped paying royalties, the royalty stream is worthless on the market.

204.    Adam Bravery LLC depends crucially on the royalty money to operate, and has necessarily ceased all operations as a direct and proximate result of BMI's breach of contract.

205.    The net value of Adam Bravery LLC was diminished by at least $150,000 as a direct and proximate result of BMI's intentional and baseless failure to pay royalties.

206.    Therefore, BMI is liable to Adam Bravery LLC for Breach of Contract.

## EIGHTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Adam Bravery LLC v. BMI)

207.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

208.    A fiduciary is a person in whom another has placed the utmost trust and confidence to manage and protect property or money. A fiduciary duty a duty to act for someone else's benefit, while subordinating one's own interests to that of the other.

209.    All lawyers are fiduciaries, which is to say they owe clients fiduciary duties. RESTATEMENT OF THE LAW GOVERNING LAWYERS, §16(3). An attorney owes the client a fiduciary duty of the very highest character. *Bird, Marella, Boxer & Wolpert v. Superior Court,* 106 Cal. App. 4th 419, 421, 130 Cal. Rptr. 2d 782, 784 (2003)

210.   A fiduciary relationship was formed between BMI (the agent-trustee) and Baker (the principal-beneficiary) upon signing the BMI-Baker Writer "Agreement" in 1999. The BMI-Baker Writer "Agreement" explicitly makes ASCAP & BMI Baker's attorney-in-fact, providing that:

> "You [Baker] make, constitute and appoint us [ASCAP & BMI], or our nominee, your true and lawful attorney, irrevocably during the Period, in our name or that of our nominee, or in your name, or otherwise, in our sole judgment, to do all acts, take all proceedings, execute, acknowledge and deliver any and all instruments, papers, documents, process or pleadings that, in our sole judgment, may be necessary, proper or expedient to restrain infringement of and/or to enforce and protect the rights granted by you hereunder..."

EXHIBIT "B", p. 14.

211.   Under the BMI-Baker Writer "Agreement", the responsibilities of BMI are closely akin to those of an escrow officer: BMI promises to collect monies due to Baker, to hold them for some period of time, to deduct its own fees, then to distribute the remainder as a royalty payment. This is the very essence of a fiduciary relationship.

212.   Baker formed with BMI a relationship of trust and confidence whereby BMI is bound to exercise the utmost good faith and undivided loyalty toward Baker throughout the relationship.

213.   By virtue of the assignment, to which BMI consented, BMI's fiduciary duty extends to Adam Bravery LLC. Nothing in the language of the assignment contracts restricts the assignability of any rights.

214.   BMI failed to pay the March 2020 royalty distribution, which is misconduct. To date, BMI has failed to pay a total of $28,496.99.

215.   Plaintiffs have no direct evidence of any bribes or kickbacks being paid. But insofar as BMI has stopped paying royalties without justification, and gone as far as concocting a false pre-text on which to do so, it is a reasonable inference that, in exchange for cooperation, Marlo pays BMI money as a bribe or kickback, in an amount and by methods to be proven to the jury at trial. Accepting such a kickback or a bribe in exchange for not paying royalties is not in Adam Bravery LLC's interest.

216.    Adam Bravery LLC depends crucially on the royalty money to operate, and has necessarily ceased all operations as a direct and proximate result of ASCAP & BMI's failure to pay royalties as it is legally obligated to do.

217.    Therefore BMI and Erika Stallings are liable to Adam Bravery LLC for Breach of Fiduciary Duty.

### NINTH CAUSE OF ACTION
### Constructive Fraud
### (Adam Bravery LLC and Alexander C. Baker v.
### BMI, Mike O'Neill and Erika Stallings in their individual capacities)

218.    Plaintiffs repeat, reallege and incorporate by reference the facts alleged above.

219.    Courts have given instructions on what constitutes constructive fraud:

> As a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent. Most acts by an agent in breach of his fiduciary duties constitute constructive fraud. The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud. Also, a careless misstatement may constitute constructive fraud even though there is no fraudulent intent.

*Salahutdin v. Valley of Cal., Inc.*, 24 Cal. App. 4th 555, 558, 29 Cal. Rptr. 2d 463, 464 (1994).

220.    Here, BMI and/or Mike O'Neill and/or Erika Stallings fabricated a false "dispute" between Marlo and Baker as a pretext to impose a royalty hold against Baker, while continuing to pay Marlo. Knowing that a Court order prohibited Baker from assigning works, BMI and/or Mike O'Neill and/or Erika Stallings falsely contended that Baker assigned works, knowing that Baker never did so. Baker assigned his own royalty stream to pay to a business entity, while ownership of the works has remained unchanged.

221.    BMI and/or Mike O'Neill and/or Erika Stallings further compounded the falsity by construing the fabricated "dispute" as being a dispute between Marlo and Baker,

1  knowing that even if there was a dispute as to the proper payee of Baker's royalty

2  stream, the dispute would be between Baker and Adam Bravery LLC. Marlo's royalties

3  have remained completely unaffected throughout, a fact known to BMI and/or Mike

4  O'Neill and/or Erika Stallings.

5  222.    BMI and/or Mike O'Neill and/or Erika Stallings compounded the falsity yet again

6  by withholding royalties only from Baker, while continuing to pay Marlo. This

7  demonstrates that BMI and/or Mike O'Neill and/or Erika Stallings do not believe there

8  is a dispute between Baker and Marlo. If there was a dispute between Baker and Marlo,

9  BMI would withhold royalties from both parties, according to their standard policy.

10  223.    Plaintiffs believe, and on that basis allege that BMI has never in its entire history

11  imposed a unilateral royalty dispute hold, such as BMI now claims to have imposed

12  unilaterally on Baker and Adam Bravery LLC. Plaintiffs believe, and upon that basis

13  allege that all other royalty dispute holds imposed by BMI in its entire history have

14  involved the withholding of royalties from both parties to the dispute.

15  224.    Knowing that there was no actual dispute between Baker and Marlo, BMI and/or

16  Mike O'Neill and/or Erika Stallings undertook a series of steps intended to entrap Baker

17  into admitting that there was a "dispute" upon which to withhold Baker's royalty

18  stream from Adam Bravery LLC. First BMI, in the person of Erika Stallings, emailed

19  Baker and simply asked him for his "position" on the "dispute". Then BMI requested

20  that Baker "stipulate" that there was a dispute.

21  225.    When the above two attempts failed to succeed in tricking Baker into "admitting"

22  there was a "dispute", BMI and/or Mike O'Neill and/or Erika Stallings then insisted that

23  Marlo file a Family Law Contempt action. Marlo did file a contempt action, alleging

24  that Baker's assignment of royalties violated the Family Court Royalty Reallocation

25  Order, and falsely claiming that Baker had assigned works. Even if there had been

26  merit to Marlo's Contempt action (which there was not), this would be a dispute

27  between Baker and the Court. Marlo never alleged that Baker's assignment of royalties

28  to the LLC harmed her or affected her in any way, because it obviously did not.

226.    The Family Court dismissed Marlo's Contempt action, jeopardy attached, it cannot be refiled, and is non-appealable. While there never was any merit to the idea that there was a "dispute" between Baker and Marlo regarding the payment of ASCAP & BMI royalties, the dismissal of Marlo's Contempt action must remove any lingering doubt, even among the uninitiated.

227.    There is no dispute between Marlo and Baker regarding the current proper payee of BMI royalties. BMI and Mike O'Neill and Erika Stallings and each of them know that there is no dispute. BMI and Mike O'Neill and Erika Stallings and each of them falsely contend that there is a dispute as a pretext for withholding royalties so as to intentionally injure Baker and Adam Bravery LLC on the one hand, while benefitting Marlo on the other hand.

228.    While Baker and Adam Bravery LLC never believed BMI in all their false representations, Plaintiffs had no choice but to rely on them. BMI has total power over the situation. If BMI doesn't pay the royalties, then the royalties are not getting paid.

229.    Because BMI and/or Mike O'Neill and/or Erika Stallings knew that there was no royalty dispute between Baker and Marlo, and expended great thought and planning towards trying to falsely convince Baker (and now the Court) that there was a dispute, and maintained the false story about a dispute even in the face of the Family Court dismissing Marlo's contempt action, the only reasonable inference to be drawn by the jury is that BMI and/or Erika Stallings acted with actual premeditated malice toward Plaintiffs.

230.    BMI and/or Mike O'Neill and/or Erika Stallings knew that withholding money from Adam Bravery LLC would injure and quite possibly destroy the business, BMI and/or Mike O'Neill and/or Erika Stallings knew it was wrong to do so, and did it anyway, having accepted money from as a bribe or kickback, in an amount and by methods to be proven to the jury at trial. While Plaintiffs have no direct evidence of this bribe or kickback, it is a reasonable inference from the facts which are known. At trial, Plaintiffs will ask the jury to make this inference.

231.    Adam Bravery LLC depends crucially on the royalty money to operate, and has necessarily ceased all operations as a direct and proximate result of BMI and/or Mike O'Neill and/or Erika Stallings withholding payment.

232.    The net value of Adam Bravery LLC has diminished by at least $150,000 as a direct and proximate result of Defendants' intentional actions of withholding the royalties without justification.

233.    Plaintiffs believe, and on that basis allege that BMI has a policy and custom allowing for dishonest and injurious conduct, on an ad hoc basis. Alternatively, Plaintiffs allege that BMI does not have such a policy and custom, and that Erika Stallings and/or Mike O'Neill and/or Does acted on thier own volition.

234.    BMI and/or Erika Stallings and/or Mike O'Neill withholding money constitutes malice, fraud and/or oppression as defined in California Civil Code § 3294.

235.    Therefore BMI and Erika Stallings and Mike O'Neill and each of them are jointly and severally liable to Plaintiffs for constructive fraud.

### TENTH CAUSE OF ACTION
#### Intentional Infliction of Emotional Distress
#### (Alexander C. Baker v. BMI,
#### Mike O'Neill and Erika Stallings in their individual capacities)

236.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

237.    Proving Intentional Infliction of Emotional Distress requires a showing that Defendant's conduct was both "extreme" and "outrageous". The words "extreme" and "outrageous" are not synonymous. Rather, they function as a double threshold for the nature of the conduct and how unusual it is. Restatement (Third) of Torts: Liability for Physical and Emotional Harm. § 46. (Am. Law Inst. 2012).

238.    Here, BMI and/or Mike O'Neill and/or Erika Stallings's conduct is extremely unusual, because it is the only time in BMI's entire existence that they have ever imposed a unilateral dispute hold, i.e. withholding money from one party to the supposed dispute, while paying the other.

239.   Knowing that there was no actual dispute between Baker and Marlo, BMI and/or Mike O'Neill and/or Erika Stallings undertook a series of steps intended to entrap Baker into "admitting" that there was a "dispute" upon which to withhold Baker's royalty stream from Adam Bravery LLC. First BMI and/or Mike O'Neill and/or Erika Stallings emailed Baker and simply asked him for his "position" on the "dispute". When Baker declined, ASCAP & BMI and/or Erika Stallings falsely threatened to withhold Plaintiff's money. This is extreme and outrageous conduct. Knowing that Baker depends on the royalty money to survive, BMI's conduct was extreme, and outrageous, and intended to cause emotional distress.

240.   BMI paid royalties in September 2019. Then, BMI and/or Mike O'Neill and/or Erika Stallings requested that Baker "stipulate" that there was a dispute.  After Baker refused to "stipulate" to a dispute (whatever that means), Marlo filed a Contempt action, alleging that Baker's assignment of royalties violated an Order of the Family Court. Because the Contempt action was baseless, and because it came only after BMI attempted to get Baker to "stipulate" to a dispute, it is reasonable to infer that BMI and/or Mike O'Neill and/or Erika Stallings then instructed Marlo to file the baseless Contempt action.

241.   After the Contempt action was filed, BMI and/or Mike O'Neill and/or Erika Stallings again threatened to withhold the money.

242.   Marlo's Contempt action was dismissed. Even after the Contempt action was dismissed with no possibility of appeal or refilling, BMI and/or Mike O'Neill and/or Erika Stallings continued to insist that they would withhold the money. BMI's conduct was extreme, outrageous and intended to cause emotional distress. BMI and/or Mike O'Neill and/or Erika Stallings knew at all times that Baker depended on the royalty money to survive.

243.   BMI and/or Mike O'Neill and/or Erika Stallings's threat of withholding turned out to be false again, as BMI paid the royalties in January 2020. BMI paid the royalties again in March 2020. But then, BMI and/or Mike O'Neill and/or Erika Stallings

1  reversed charges and took the money back. As emotionally injurious as the false threats

2  of withholding money are, making good on those threats is even more injurious.

3  244.    In repeatedly threatening to withhold money, and then actually withholding

4  money, with the full knowledge that there is no valid basis to withhold the money, BMI

5  and/or Mike O'Neill and/or Erika Stallings acted to intentionally injure the psyche of

6  Baker.

7  245.    BMI and/or Erika Stallings injured Baker by depriving him of his livelihood,

8  starving him and threatening him with homelessness Because neither BMI nor Erika

9  Stallings have any legal basis for withholding the royalty money has now been done,

10  the question of motive is reasonably raised. In addition to the reasonable inference of

11  bribes and kickbacks, Plaintiffs reserve the right to allege a motive such as bias based

12  on race, or sex, or any other motive revealed in discovery, or reasonably implied by

13  facts obtained in discovery.

14  246.    Whatever the motives, Erika Stallings and Mike O'Neill and BMI have the

15  power to destroy Baker's life, and they have done so, on purpose and with particular

16  glee. BMI and/or Erika Stallings and/or Mike O'Neill knew at all relevant times that

17  Baker has no options when it comes to his royalties.

18  247.    At minimum, BMI and/or Erika Stallings and/or Mike O'Neill acted with reckless

19  disregard of the probability that Baker would suffer emotional distress, knowing that

20  Baker depended on the money to survive, and knowing that all reasonable people will

21  be expected to suffer emotional distress if deprived of their livelihood for no legally

22  valid reason.

23  248.    With respect to the requirement that the plaintiff show severe emotional distress,

24  the courts have set a high bar. Severe emotional distress means "emotional distress of

25  such substantial quality or enduring quality that no reasonable [person] in civilized

26  society should be expected to endure it." *Potter v. Firestone Tire & Rubber Co*, 6 Cal.

27  4th at 1004.

28

249.   Here, no reasonable person could be expected to endure the emotional distress of having BMI and/or Erika Stallings and/or Mike O'Neill baselessly threaten to withhold the source of livelihood, then actually withholding the source of livelihood. BMI and/or Mike O'Neill and/or Erika Stallings' repeated efforts to fabricate a false "dispute" as a pretext for stopping royalties, including but not limited to attempting to trick Baker into "stipulating" that there was a "dispute", are extreme and outrageous conduct by any reasonable standard.

250.   In deciding whether conduct meets the threshold of "outrageous", the RESTATEMENT (SECOND) OF TORTS §46(1)(1965) instructs us that the existence of a special relationship in which there is  "abuse of a position, or a relation with the other, which gives [the  actor] … the power to affect [the] interests"... of another may "produce a character of  outrageousness  that  otherwise  might  not  exist." *Bridges v. Winn Dixie*, 176 Ga. App. 227, 230, 335 S.E.2d 445,447 (1985).

251.   Here, BMI occupies a vastly superior position of bargaining power as compared to Baker. If Baker wants to collect performance royalties, he must agree to BMI's terms, which terms are mandated in the Consent Decree. Baker has no bargaining power whatsoever. It is "take it or leave it".

252.   If Baker had any power vis-à-vis BMI whatsoever, then the moment BMI started abusively threatening to withhold royalties, he would have quit BMI and obtained performance royalties elsewhere. Under the terms of the BMI-Baker Writer "Agreement", and under the Consent Decree, which is the law, as far as Baker understands, it is not possible to change affiliation on any music titles in the past. As to all those royalty-earning music titles on which Baker has been getting paid for over two decades, Baker and BMI are "stuck with each other".

253.   Plaintiff Alexander C. Baker has suffered severe emotional distress, including fear, worry, mortification, outrage, shame, humiliation, degradation, anger, and depression. Baker faces the prospect of being homeless. Baker has extreme difficulty

1  concentrating because he can't process or accept how the system allows BMI and Erika

2  Stallings and Mike O'Neill to perpetrate such intentional injury.

3  254.    The intentional, malicious conduct of Defendants is maddening, and would be

4  maddening to any reasonable person similarly-situated to Baker. Baker suffers Post

5  Traumatic Stress Disorder, but cannot afford the medical treatment required, which

6  inability to afford treatment is directly and proximately caused by Defendants' tortious

7  conduct described herein, and which inability to afford necessary treatment compounds

8  the severity of Baker's emotional distress caused by Defendants.

9  255.    Plaintiffs believe, and on that basis allege that BMI has a policy and custom

10  allowing for extreme and outrageous conduct, on an ad hoc basis. Alternatively,

11  Plaintiffs allege that BMI does not have such a policy and custom, and that Erika

12  Stallings and/or Mike O'Neill and/or Does acted on their own volition.

13  256.    Defendants' conduct is the direct and proximate cause of Baker's emotional

14  distress.

15  257.    Therefore, BMI, Erika Stallings and Mike O'Neill are jointly and severably liable

16  to Baker for Intentional Infliction of Emotional Distress.

17  
                        **ELEVENTH CAUSE OF ACTION**
18  
                           **Fraudulent Inducement**
19  
     **(Alexander C. Baker v. BMI and Erika Stallings in her individual capacity)**

20  258.    Plaintiff repeats, realleges and incorporates by reference the facts alleged above.

21  259.    The elements of fraudulent inducement are: (1) a knowingly false representation

22  by the defendant; (2) and intent to deceive or induce reliance; (3) justifiable reliance by

23  the plaintiff; and (4) resulting damage. Every element of the cause of action for fraud

24  must be alleged in full, factually and specifically. *Wilhelm v. Pray, Price, Williams &*

25  *Russell* (1986) 186 Cal.App.3d 1324, 1332. The critical pleading elements are that a

26  misrepresentation was made, Defendants knew it untrue at the time, and they intended

27  Plaintiff rely on the misrepresentation. At the pleading stage an averment that

28  defendant knew it untrue and that Defendant intended reliance is sufficient.

1 | *Charpentier v. Los Angeles Rams Football Co., Inc.* (1999) 75 Cal. App.4th 301, 312.

2 | Further, the specificity pleading requires facts that "show how, when, where, to whom,

3 | and by what means the representations were tendered." *Lazar v. Superior Court* (1996)

4 | 12 Cal.4th 631, 645.

5 | 260.    Alleging fraud against a corporation must include the names of the persons who

6 | made the misrepresentations; their authority to speak for the corporation; to whom they

7 | spoke; what they said or wrote; and when it was said or written. See *Lazarat* 645;

8 | *Tarmann v. State Farm Mut. Auto. Ins. Co*. (1991) 2 Cal. App. 4th 153, 157; *Perlas v.*

9 | *GMAC Mortg., LLC* (2010) 187 Cal. App. 4th 429, 434.

10 | 261.    On August 26, 2019, after BMI began threatening to withhold royalties, Baker

11 | filed into the Family Law case a Motion for Joinder, seeking to add BMI as a party.

12 | Baker sought a simple order that BMI was required to pay royalties in equal amounts to

13 | both he and to Marlo, as the July 7, 2016 stipulation and order require, as the July 18,

14 | 2016 Letter of Direction instruct BMI to do, and as BMI has in fact been doing since

15 | September 2016.

16 | 262.    On September 3, 2019, Baker was contacted by email by attorney AnnMarie

17 | Mori, representing BMI. Plaintiff believes that Erika Stallings was at all times making

18 | the substantive decisions. Ms. Mori discussed the situation between Baker and Marlo,

19 | and concluded:

20 | 
21 | > Therefore, it does not appear that Mr. Baker or Ms. Marlo dispute that at this time the royalty payments should continue to be distributed 50/50.

22 | EXHIBIT O, p. 76

23 | 263.    In the days immediately following September 3, 2019, Ms. Mori on behalf of

24 | BMI indicated that BMI wished to enter into a stipulation with Baker under which

25 | Baker would dismiss the Motion for Joinder seeking to join BMI to the Family Law

26 | case, and BMI would promise to be bound by any order the Family Court would make

27 | allocating the royalties.

28 |

264.    On or about September 12, 2019, a phone call was made between AnnMarie Mori for BMI, Baker, and attorney Marc Angelucci. The purpose of the call was to discuss the terms of the stipulation to relieve BMI from joinder. Baker sought assurances that, until further order of the Family Court, that BMI would continue to pay royalties, just as they had been doing. Ms. Mori repeated her assurances from the Sept. 3 email, stating:

> There is not a dispute regarding the current allocation of royalties. It is our understanding that that issue will be decided at trial.  Nothing will change at BMI until either the parties stipulate and we receive a new Letter of Direction, or there is a new Court Order.

265.    BMI's statement "it does not appear that Mr. Baker or Ms. Marlo dispute that at this time the royalty payments should continue to be distributed 50/50" is true, but highly misleading, because it is clearly intended to convince Baker that BMI would not stop paying royalties, when in fact BMI was planning to stop paying Baker's royalties all along. BMI knew that the statement was highly misleading and intended to induce a false belief in Baker that BMI would continue to pay royalties.

266.    BMI's statement "Nothing will change at BMI until either the parties stipulate and we receive a new Letter of Direction, or there is a new Court Order" is false, because something did change at BMI – they stopped paying Baker's royalties to Adam Bravery LLC – despite the fact that Marlo and Baker have not issued any new Letter of Direction, nor has there been a new Court Order regarding the allocation of royalties. ASCAP & BMI was planning to stop paying Baker's royalties all along, thus ASCAP & BMI knew it was a false statement.

267.    Both of BMI's above statements were intended to deceive Baker, and to induce him into believing that BMI would not stop paying royalties, when in fact BMI was so intending to stop paying royalties.

268.    Both of the above statements were intended to induce Baker's reliance, because Baker had brought a Motion for Joinder seeking to join BMI to the Family Law case, and BMI knew that Baker would not agree to release BMI from the Joinder Motion

1    unless he was deceived into thinking that BMI would continue to pay royalties as the

2    BMI-Baker Writer "Agreement" requires, as the Consent Decree requires, as the July 7,

3    2016 Court Order requires, and as the July 18, 2016 Letter of Direction requires.

4    269.    Baker relied on BMI's September 3, 2019 false statement that "it does not appear

5    that Mr. Baker or Ms. Marlo dispute that at this time the royalty payments should

6    continue to be distributed 50/50." Baker relied on BMI's false statement "Nothing will

7    change at ASCAP & BMI until either the parties stipulate and we receive a new Letter

8    of Direction, or there is a new Court Order." Had Baker not received these false

9    assurances, Baker would not have agreed to the stipulation dismissing the Joinder

10    action against BMI.

11    270.    On or about September 25, 2019, Baker did in fact sign a stipulation with BMI,

12    dismissing the Joinder. EXHIBIT "P", p. 80-82.

13    271.    On information and belief, Plaintiff alleges that BMI has a custom and policy

14    which permits it to make fraudulent misrepresentations, despite such fraudulent

15    misrepresentations being generally contrary to public policy. As an alternative theory,

16    Plaintiff alleges that BMI does not have such a policy, but that Erika Stallings in her

17    individual capacity was directly responsible for crafting and implementing intentional

18    misrepresentations.

19    272.    Baker was damaged in his reliance on the false statements by BMI, because had

20    he not dismissed the Joinder action, he could have obtained a Court order compelling

21    BMI to obey the July 7, 2016 Order equalizing royalties between Baker and Marlo.

22    273.    Plaintiffs believe, and on that basis allege that BMI has a policy and custom

23    allowing for dishonest and injurious conduct, on an ad hoc basis. Alternatively,

24    Plaintiffs allege that BMI does not have such a policy and custom, and that Erika

25    Stallings acted on her own volition.

26    274.    Therefore, BMI and/or Erika Stallings are liable to Baker for fraudulent

27    inducement.

28

# XIII.  PRAYER FOR RELIEF ON UNDERLYING CLAIMS

275.    Wherefore, Plaintiffs pray for relief as follows:

## A.    Damages

276.    **General Damages** – for Baker's pain and suffering, for Adam Bravery's lost business, and for all other such general damages as are reasonably certain to flow from the misconduct proven, in an amount found reasonable at trial, but not less than $1,000,000;

**Actual Damages** – for the total value of Plaintiffs' royalty stream, plus medical expenses, plus all other money damages actually and proximately caused by Defendants' conduct, such amounts to be proven at trial, but not less than $200,000;

**Punitive Damages** - to punish Defendants for intentionally tortious conduct, to make examples of them, and to deter others from similar conduct, in an amount deemed sufficient to achieve the purpose of punitive damages, in light of BMI's stated yearly revenue of over $1 billion, and the net worth of Erika Stallings and of Mike O'Neill, subject to proof;

## B.    Injunction

For a permanent injunction compelling BMI to pay the performance royalties due and payable for performances of Alexander C. Baker's musical works to Adam Bravery LLC, or whomever shall in the future become a valid assignee of said royalties, such payments to be at all times compliant with any pending court order as to proper allocation;

For a permanent injunction prohibiting BMI from requiring a Mandatory Arbitration Clause as a pre-condition of obtaining performance royalties;

For a permanent injunction prohibiting BMI from disclaiming a fiduciary duty to Baker;

## C.    Costs and Fees

For the cost of the suit plus pre-judgment interest;

1    For attorney fees as allowed by statute and/or by contract; and

2    For any other such relief as the Court may deem appropriate.

3

4    **XIV.  DEMAND FOR JURY TRIAL**

5    Plaintiffs hereby demand a jury trial on all issues so triable.

6

7                    Respectfully submitted on December 7, 2020,

8

9

10    _____

11                    G. Scott Sobel, Esq.
                    *Attorney for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

## VERIFICATION AND SWORN DECLARATION
## OF ALEXANDER C. BAKER

4

5

6

7

8

9

I am the Plaintiff in this case. I have personal knowledge of the facts stated within this complaint, and hereby attest to its accuracy. The documents attached hereto as exhibits to the complaint are true and correct copies of the documents they purport to be. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

10

Respectfully submitted on November 5, 2020,

11

12

Alexander C. Baker

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLD ASCAP & BMI ACCOUNTABLE - CLASS ACTION COMPLAINT